## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THOMAS BILLARD, derivatively and on behalf   )
of LIQUIDITY SERVICES, INC.,   )
91 Burrows Hill Road   )
Amston, CT 06231-1204   )
  )
               Plaintiff,   )
    v.   )
  )
WILLIAM P. ANGRICK,   )
1920 L Street NW   )    Civ. No. _____
Washington, DC 20036   )
  )
PHILLIP A. CLOUGH,   )
1920 L Street NW   )    VERIFIED DERIVATIVE
Washington, DC 20036   )    COMPLAINT
  )
GEORGE H. ELLIS,   )
1920 L Street NW   )
Washington, DC 20036   )    **JURY TRIAL DEMANDED**
  )
PATRICK W. GROSS,   )
1920 L Street NW   )
Washington, DC 20036   )
  )
BEATRIZ INFANTE,   )
1920 L Street NW   )
Washington, DC 20036   )
  )
EDWARD J. KOLODZIESKI,   )
1920 L Street NW   )
Washington, DC 20036   )
  )
FRANKLIN D. KRAMER,   )
1920 L Street NW   )
Washington, DC 20036   )
  )
JAIME MATEUS-TIQUE,   )
1920 L Street NW   )
Washington, DC 20036   )
  )
JAMES M. RALLO,   )
1920 L Street NW   )
Washington, DC 20036   )

|  |  |
|---|---|
| DAVID PERDUE,<br>1920 L Street NW<br>Washington, DC 20036 | ) <br> ) <br> ) <br> ) <br> ) <br> ) |
|                 Defendants,<br>and | ) <br> ) |
| LIQUIDITY SERVICES, INC.,<br>1920 L Street NW<br>Washington, DC 20036 | ) <br> ) <br> ) <br> ) <br> ) |
|        Nominal Defendant. | ) |

## TABLE OF CONTENTS

NATURE OF THE ACTION ................................................. 1

INTRODUCTION ............................................................. 1

JURISDICTION AND VENUE ............................................ 6

THE PARTIES................................................................. 6

    A.     Current Director Defendants............................ 7
    B.     Former Director Defendants ............................ 9
    C.     Officer/Employee Defendants .......................... 9
    D.     Insider Trading Defendants............................... 10

INDIVIDUAL DEFENDANTS' DUTIES ............................... 10

HEIGHTENED DUTIES OF THE AUDIT COMMITTEE DEFENDANTS ............................ 14

CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION......................... 15

RULE 23.1 ALLEGATIONS .............................................. 16

FACTUAL BACKGROUND ............................................... 16

    E.     Background of the Company ............................ 16
    F.     Improper Statements ....................................... 17
    G.     The Company Makes Corrective Disclosure ....... 30
    H.     Insider Sales By Certain Individual Defendants... 31
    I.      Damages To The Company ............................... 35

DERIVATIVE AND DEMAND REQUIREMENT ALLEGATIONS....................................... 36

    J.     Demand Is Excused Because The Current Director
            Defendants Face A Substantial Likelihood of Liability for Their Misconduct .... 37

CAUSES OF ACTION....................................................... 47

PRAYER FOR RELIEF ..................................................... 51

## NATURE OF THE ACTION

Thomas Billard ("Plaintiff"), by and through the undersigned counsel, brings this derivative action for breach of fiduciary duty, waste of corporate assets and unjust enrichment on behalf of nominal defendant Liquidity Services, Inc. ("Liquidity Services," "Liquidity" or the "Company"), and alleges as follows against the former and current members of Liquidity Services' board of directors (the "Board") and certain officers of the Company. The allegations of this Complaint are based on the personal knowledge of Plaintiff as to himself and his own acts, and upon information and belief as to all other matters, based upon the investigation conducted by and through his attorneys, which included, among other things, a review of documents produced by Liquidity Services pursuant to a books and records demand under 8 Del. C. § 220, a review of United States Securities and Exchange Commission ("SEC") filings, news reports, press releases, various court documents, including the opinion denying the motion to dismiss in the related securities class action, *Howard v. Liquidity Services, Inc., et al.*, 1:14-cv-01183 (BAH) (D.D.C.), and other publicly available documents and information concerning Liquidity Services and the matters contained herein.

## INTRODUCTION

1.      This is a verified stockholder derivative action brought by Plaintiff on behalf of nominal defendant Liquidity Services against certain of its current and former officers and directors for violations of law, including breach of fiduciary duty, waste of corporate assets, and unjust enrichment arising from the Board's continuous and systematic failure of oversight that led to violations of the law, including violations of the Securities Exchange Act of 1934 ("Exchange Act") during the period February 1, 2012 through May 8, 2014 (the "Pertinent Period"), defendants' improper earnings guidance, misleading public statements, and insider trading during

the Pertinent Period. This wrongdoing has subjected the Company to substantial monetary losses and other damages, including but not limited to, the Company's reputation and goodwill.

2.      Defendants' breaches of fiduciary duty arise out of an a consistent and sustained pattern of misconduct whereby the Individual Defendants (defined below) (i) caused Liquidity Services to engage in unsound business practices designed to artificially enhance the Company's financial results; (ii) failed to have in place an adequate system of internal controls thereby creating a corporate culture that fostered disregard for regulatory compliance; (iii) caused the Company to disseminate materially false and misleading statements during the Pertinent Period, and omit material information necessary to make such statements not false and misleading, resulting in the artificial inflation of the price of the Company's stock; and (iv) caused the Company to engage in unsound business practices so as to unjustly and improperly enrich and benefit themselves to the detriment of the Company and, derivatively, its shareholders through substantial insider stock sales and executive compensation packages tied to the Company's overstated financial results and performance, including over $106 million in insider sales during the Pertinent Period.

3.      Founded in 1999, Liquidity Services, formerly operating as Liquidation.com, provides online auction marketplaces for buyers and sellers of surplus and salvage assets in the United States, and enables corporate and government sellers to enhance their financial return on excess assets by offering liquid marketplaces and value-added services.  By 2005, the Company gained the exclusive right to manage and sell all United States Department of Defense ("DoD") scrap property, and the majority of its revenue came from its DoD contracts. The Company is headquartered in Washington, District of Columbia.

4.      Although revenue from the DoD contracts were lucrative, the contracts were never a guaranteed source of income because of the competitive nature of the mandatory bidding process

required under U.S. law.  The Company understood that it needed to diversify its operations to lessen its substantial dependence on the DoD contracts, i.e., expanding into the retail market and capital assets market, via expanding the Company's geographical reach and client base, and ultimately, acquiring competing companies.

5.      Accordingly, the Company began purchasing companies as part of its growth strategy. For example, in mid-2012, Liquidity Services bought GoIndustry, a global provider of surplus asset management, auction, and valuation services.  The Company initiated a PR campaign to tout its growth, through investor conference calls and disseminating this narrative to Wall Street analysts.

6.      On July 31, 2012, Angrick said Liquidity "advanced all key elements of our growth strategy during [the second quarter], driving organic growth, innovation and external growth via acquisition," and that the Company was on track to meet a growth target of 15-20%. The Company also touted the strength of its retail and capital market divisions, and emphasized the importance of the acquisition of GoIndustry. However, GoIndustry never turned a profit during the Pertinent Period.

7.      Similarly, the acquisition of Network International, an oil and gas assets business was also a failure. The Company learned about the macroeconomic weaknesses in the energy business sector in August 2013 but failed to disclose these problems until nearly a year later.

8.      By mid-2013, when Plaintiff purchased his shares in Liquidity, the Company was (unbeknownst to Plaintiff) concerned that the DoD would not renew Liquidity's contract and that Liquidity's primary competitors in the field were in a position to compete for these contracts.  By June 2013, the Company had a grave concern that the DoD contract would not be renewed.  This was borne out in August 2013, when the DoD informed the Company that it would issue a

competitive Request for Proposal ("RFP") and that a decision would be made in February 2014. The Company, knowing that its business depended heavily on the DoD contract, knew that it would have to diversify by expanding into the retail supply chain market and acquire competing businesses.

9.      When these strategies failed to execute successfully, the Company began to manipulate sales numbers while revenues and margins declined through 2013 and 2014. Meanwhile, the Company began issuing materially misleading statements to conceal the operational problems from the investing public.

10.     The insiders and the Board knew that internal assessments of the Company were not as rosy as the Company had claimed, and Liquidity's public statements to its stockholders and the public at large were therefore materially false and misleading.  For example, the Company's retail supply chain division was facing deteriorating margins and revenues throughout this period. Increased competition in the market had also forced Liquidity to enter into contracts at reduced rates, further cutting into the Company's profitability.

11.     Moreover, the retail segment of the Company appeared to be doing well due to manipulation of sales figures by the Vice President of the Retail Supply Chain Group.  In fact, Liquidity had a Company-wide culture of overstating sales goals.

12.     Despite these problems plaguing the Company, Defendants continued to mislead investors regarding the health of Liquidity's business. Stockholders were therefore entirely unprepared for the Company's May 8, 2014 press release regarding its fiscal 2014 second quarter results, which revealed that the Company had suffered "unforeseen" losses and was forced to drastically reduce its guidance for the remainder of the fiscal year 2014.

13.     In reaction to the news, Liquidity's share price decreased 30% from $17.31 on May 7, 2014 to $12.17 on May 8, 2014.

14.     The materially misleading information disclosed to investors was well known to the Individual Defendants. They knew that Liquidity was experiencing headwinds in the industry, and that it would have a detrimental effect on the Company's growth. The Individual Defendants also knew about the intense competition in the industry and the Company was forced to discount rates with customers and partners.

15.     The Individual Defendants had a motive to mislead stockholders. Angrick sold twice as much stock during the period between February 1, 2012 and May 7, 2014 as he had in the prior two years.  After earning $15.3 million from stock sales in the prior two years, Angrick sold 1,706,610 shares during the period in question, for proceeds in excess of $68 million. Many of these sales were suspiciously large, including several that were 100,000 shares or more, occurring in the days right after public releases of good results or right before releases of bad ones.  The other Individual Defendants made suspiciously-timed sales of Company stock as well, as detailed below.  At the time of the sales, the Individual Defendants knew that the Company's financial statements were materially false and misleading.

16.     As a direct result of this unlawful course of conduct, the Company is now the subject of a federal securities class action lawsuit pending in the United States District Court for the District of Columbia, on behalf of investors who purchased Liquidity Services' shares. Recently, the District Court denied a motion to dismiss the suit.  *See Howard v. Liquidity Servs.*, 2016 U.S. Dist. LEXIS 43417 (D.D.C. Mar. 31, 2016) (the "Howard Decision").

17.     Despite the overwhelming "red flags" signaling continuous wrongful conduct confronting the Board, the directors continued to recklessly ignore the misconduct and consciously

chose to look the other way, as evidenced by the Company's public actions and the minutes of Board meetings obtained by Plaintiff's request for document pursuant to 8 Del. C. § 220 demonstrating the Board's acquiescence of the Company's repeated wrongdoing.

18.     This litigation brought derivatively on behalf of Liquidity Services seeks to rectify the conduct of the individuals bearing ultimate responsibility for the Company's conduct—the Company's current and former directors and senior management—and to impose appropriate responsibility upon those individuals for the wrongdoing alleged herein, and also seeks prospective remedies to avoid a recurrence of the wrongdoing.

## JURISDICTION AND VENUE

19.     Jurisdiction of this Court is founded upon: (a) diversity of citizenship, 28 U.S.C. § 1332, and (b) supplemental jurisdiction, 28 U.S.C. § 1367(a).  Plaintiff is a citizen of the State of Connecticut.  The defendants are all citizens of jurisdictions other than Connecticut.  The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

20.     The Individual Defendants are all current or former members of the Board, executive officers or high level employees of Liquidity Services, a company organized under the General Corporation Law of the State of Delaware with headquarters in Washington, D.C.

21.     This Court has personal jurisdiction over the current and former director defendants given their service on the Board of a Delaware corporation with its principal office in the District of Columbia and the nature of the fiduciary duty claims alleged in this Complaint.

22.     This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.  This action does not allege securities fraud or any other fraud and seeks specific, monetary and equitable relief on behalf of the Company.

## THE PARTIES

A.     **Plaintiff**

23.     Plaintiff Thomas Billard is, and has been since June 2013, a stockholder of Liquidity Services' common stock, and will retain holdings in the Company through the course of this litigation. While some of the wrongdoing described herein predates Mr. Billard's purchase of stock, he was unaware of it at the time he purchased his shares.  Mr. Billard is a resident of Connecticut.

**B.     Nominal Defendant**

24.     Nominal Defendant Liquidity Services is a Delaware corporation with its principal place of business at 1920 L St. NW, 6th floor, Washington, D.C. 20036.  The Company stock is publicly traded on the NASDAQ Stock Exchange under the ticker symbol "LQDT."

**C.     Current Director Defendants**

25.     Defendant Angrick co-founded Liquidity Services in 1999, then-named Liquidation.com with two classmates from business school, one of whom is Defendant Jaime Mateus-Tique ("Tique"). Angrick has been the Company's CEO and Chairman of the Board since January 2000.  Angrick sold 1,706,610 shares during the Pertinent Period , for proceeds in excess of $68 million.  Angrick is a resident of Maryland.

26.     Defendant Tique co-founded Liquidity Services and served as President, Chief Operating Officer ("COO") and Director of the Company from April 2000 to September 2009, when he retired as President and COO, but remained on the Board as a member. Between February 2012 and June 2012, Tique sold 232,000 shares of Company stock for proceeds of $12,690,740. Tique is a resident of New York State.

27.     Defendant Phillip A. Clough ("Clough") has served on the Board since September 2004 and is currently a member of the Board's Compensation Committee. On May 10, 2012,

Clough sold 69,002 shares of Company stock at $65.56 per share for proceeds of $4,523,771. Clough is a resident of Florida.

28.     Defendant Patrick W. Gross ("Gross") joined the Board in February 2001 and serves as a member of the Board's Audit Committee and the Corporate Governance and Nominating Committee. Between March 2, 2012 and April 2, 2012, Gross sold 139,375 shares of Company stock for proceeds of $7,144,962.  Gross is a resident of Maryland.

29.     Defendant Beatriz Infante ("Infante") joined the Board in May 2014 and is currently a member of the Board's Audit Committee and the Chair of the Compensation Committee.    Infante is a resident of California.

30.     Defendant George H. Ellis ("Ellis) joined the Board in May 2010 and currently serves as Chair of the Board's Audit Committee. Ellis sold 8,400 shares of Company stock on February 6, 2012 for $40 per share for proceeds of $336,000 and 6,612 shares of Company stock on May 10, 2012 for $65.22 per shares for proceeds of $431,234.  Ellis is a resident of Texas.

31.     Defendant Edward J. Kolodzieski ("Kolodzieski") joined the Board in November 2015 and currently serves as a member of the Compensation Committee and the Corporate Governance and Nominating Committee.  Kolodzieski is a resident of Florida.

32.     A review of the Company's Board minutes and other documents produced to Plaintiff pursuant to 8 Del. C. § 220 reveals that from 2012 through 2014, the Board met nineteen (19) times: eight (8) meetings in 2012, six (6) meetings in 2013, and five (5) meetings in 2014. Board meetings typically include corporate updates from the Company General Counsel and the head of each business segment. The Audit Committee met fifteen (15) times in the same period: five (5) meetings each for years 2012, 2013, and 2014.

33.     Defendants named in paragraphs 25 through 31 are referred to herein as the "Current Director Defendants."

**D.     Former Director Defendants**

34.     Defendant Franklin D. Kramer ("Kramer") was the Lead Director Board until his resignation in August 2013. He was a member of the Audit Committee, Compensation Committee, and Chair of the Corporate Governance and Nominating Committee. On May 15, 2012, Kramer sold 150,000 shares of Company stock for proceeds of $9,523,997.   Kramer is a resident of Washington, D.C.

35.     Defendant David A. Perdue, Jr. ("Perdue") served on the Board from December 2009 until December 31, 2014, when he resigned following his election to the United States Senate. Perdue was a member of the Compensation Committee and the Corporate Governance and Nominating Committee.  Perdue is a resident of Georgia.

36.     Defendants named in paragraphs 34 through 35 are referred to herein as the "Former Director Defendants."

**E.     Officer/Employee Defendants**

37.     In addition to being named as a Current Director Defendant, Defendant Angrick is also named as an Officer/Employee Defendant. As stated herein, Angrick sold 1,706,610 shares of Company stock during the Pertinent Period for proceeds in excess of $68 million.

38.     Defendant James M. Rallo ("Rallo") was the Company's Chief Financial Officer ("CFO") from February 2005 to August 2015 and served as its Principal Accounting Officer. Rallo is currently the President of Retail Supply Chain Group and has been since February 2014. During the Pertinent Period, Rallo sold 71,103 shares of Company stock for proceeds of $3,343,200.  Rallo is a resident of Maryland.

F.      **Insider Trading Defendants**

39.     In addition, the following defendants are also named herein as "Insider Trading Defendants:" Angrick, Tique, Clough, Gross, Ellis, Kramer, and Rallo.

40.     The defendants named in paragraphs 25 through 38 are also referred to herein as the Individual Defendants.

## INDIVIDUAL DEFENDANTS' DUTIES

41.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of loyalty, due care and good faith.

42.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

43.     The Individual Defendants were responsible for maintaining and establishing adequate internal controls for the Company, and to ensure that the Company's public statements were based on accurate research, financial and operational information, and were not presented in a misleading manner.

44.     According to the Board's Corporate Governance Guidelines, the Board's role is stated as:

> The Board, which is elected by the Company's stockholders, oversees the management of the Company and its business. The Board selects the senior management team, which is responsible for operating the Company's business, and monitors the performance of senior management. The Board also reviews the Company's long-term strategic plan and business unit initiatives at least annually.

45.     To discharge their duties, the Board of Liquidity Services was required to, *inter alia*, exercise reasonable and prudent supervision over the selection, oversight, performance, and performance monitoring of management and employees, as well as policies, standards, practices and controls of the Company as set forth in Liquidity Services' governing corporate documents, including its Code Of Business Conduct and Ethics and the Liquidity Services Board Of Directors Corporate Governance Guidelines.

46.     The named Officer/Employee Defendants owe fiduciary duties to Liquidity Services as officers because they each held high ranking positions within the Company.  The Officer/Employee Defendants further owe fiduciary duties as key managerial personnel who ran divisions of the Company, supervised tiers of employees, participated in strategic planning and execution of Company objectives, and/or participated in Company financial decisions.  The Officer/Employee Defendants further owe duties pursuant to principles of agency law as agents of the Company privy to matters of interest and significance.

47.     It is settled Delaware law, which governs the internal affairs of the Company, that corporate officers owe fiduciary duties that are identical to those owed by corporate directors.  The Officer/Employee Defendants are therefore in a fiduciary relationship with Plaintiff and the other public stockholders of Liquidity Services and owe them the highest obligations of loyalty, care, good faith and fair dealing.

48.     As agents of Liquidity Services, its officers and employees, including the named Individual Defendants, were obligated not to mislead stockholders and the public who were not privy to their superior knowledge, and had a duty to disclose information to their superiors because they knew it may affect Liquidity Services' decisions.

49.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Liquidity Services, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

50.     Because of their advisory, executive, managerial, and directorial positions with Liquidity Services, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and growth prospects of Liquidity Services. While in possession of this material, non-public information, the Individual Defendants made improper representations regarding the Company, including information regarding the nature of Liquidity's revenue and future revenue projections.

51.     Liquidity Services' public disclosures and statements regarding its services made to the public were identical or consistent with the messages that were aimed directly at the stockholders and potential investors at the time.  The Liquidity Services Investor Relations website includes the Company's news and press releases, financials, SEC filings, presentations used at events and transcripts related to those events.

52.     By making false and misleading statements, or failing to correct such statements, to the public, and/or investors or stockholders, and/or making statements or failing to correct misstatements made internally to Liquidity Services management and directors that were the basis for disclosures to the public and stockholders, the Officer/Employee Defendants breached their duties to Liquidity Services and the Company's stockholders.  The Officer/Employee Defendants also breached their fiduciary obligations and agency duties by failing to report concerns and correct misstatements of which they were aware either directly via their superiors or via the established reporting mechanisms put in place by the Company.  To the extent any of the Officer/Employee

Defendants did utilize those reporting mechanisms, the failure of oversight is a breach of Director Defendants' duties, as explained herein.

53.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Liquidity Services were required to, among other things:

a)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health;

b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

c)     refrain from acting upon  material, inside corporate information to benefit themselves;

d)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business and to avoid wasting the Company's assets;

e)     remain informed as to how Liquidity Services conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

f)     ensure that the Company was operated in a diligent,  honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**HEIGHTENED DUTIES OF THE AUDIT COMMITTEE DEFENDANTS**

54.     Defendants Ellis, Gross, and Infante are also known as the "Audit Committee Defendants." The Individual Defendants, particularly the Audit Committee Defendants were responsible for compliance with legal and regulatory requirements, maintaining and establishing adequate internal accounting controls for the Company and ensuring that the Company's financial statements were based on accurate financial information.

55.     As set forth on the Company's website, the Audit Committee meets regularly to review internal control matters, meeting in private sessions with the independent auditors, the CFO, and the General Counsel, to discuss the results of their work, including the adequacy of internal financial controls and quality of financial reporting. Moreover, the Audit Committee reviews and approves SEC filings.

56.     In addition, by reason of Ellis, Infante, and Gross's positions as current members of the Audit Committee, they are subject to additional responsibilities to the public stockholders of Liquidity Services.   According to the Audit Committee Charter, the purpose of the Audit Committee is:

> to provide assistance to the Board of Directors in fulfilling its oversight responsibility relating to: (i) the accounting and financial reporting processes of the Company, the preparation and integrity of the Company's financial statements, and the Company's financial statement audits; (ii) the independent auditor's qualifications and independence; (iii) the Company's internal controls and procedures; and (iv) the performance of the Company's internal audit function and independent auditors.

57.     Further, according to the Charter, the Audit Committee:

- shall oversee the Company's compliance programs with respect to legal and regulatory requirements and the Company's code of conduct and procedures to monitor compliance.

- shall review management's assessment of the effectiveness of internal control over financial reporting….The Committee shall discuss with management, the internal auditors, and the independent auditors the adequacy and effectiveness of internal control over financial reporting, including any significant deficiencies or material weaknesses identified by management of the Company….

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

58.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

59.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) facilitate their own illicit sales of personally held shares while in possession of material, non-public information; and (ii) enhance the Individual Defendants' executive and directorial positions at the Company and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

60.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue improper financial statements.

61.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust

enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

62.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

63.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of this overall contribution to and furtherance of that wrongdoing.

## RULE 23.1 ALLEGATIONS

64.     This action is a stockholders' derivative action brought pursuant to Fed. R. Civ. P. 23.1.

65.     Plaintiff is a current stockholder of the Company and has continuously owned such shares of stock of the Company since June 2013.

66.     As detailed in the section entitled Derivative and Demand Requirement Allegations, *infra*, making a demand on the Board would be futile and Plaintiff has standing to proceed in this stockholder derivative action.

## FACTUAL BACKGROUND

### A.     Background of the Company

67.     As stated herein, Liquidity Services provides online auction marketplaces for surplus and salvage assets, and derives its revenue from retaining a percentage of the proceeds

from the sales it manages for its sellers. The business, however, found most of its business dependent on government contracts. The relationship with DoD, however, was not a guaranteed one, as these contracts were subject to a competitive bidding process.

**B.    Improper Statements**

68.    The Company knew it had to diversify its operations to lessen its substantial dependence on the DoD, and had a strategy of maintaining its margins, what the Company called "organic" growth, and expanding the geographic reach and client base of its retail market, i.e., via acquisitions, what the Company called "inorganic" growth.

69.    The Company was unsuccessful in implementing these strategies, and faced problems in both its retail and capital assets divisions, with deteriorating margins and revenues. However, instead of informing the investing public, the Individual Defendants repeatedly claimed that the Company was experiencing a strong momentum in organic growth while omitting the competition it was facing with the DoD contracts. To further mask its problems with investors, the Board allowed the Company to manipulate the sales figures to create an image of profitability, and falsely represent that the acquisitions were lucrative that added to the Company's growth story.

70.    The Company regularly assured analysts and investors that the Company was poised for sustained growth. On February 1, 2012, the Company issued a press release announcing its financial results for the first quarter of fiscal year 2012. For the quarter, Liquidity reported record revenue of $106 million, an increase of approximately 35% from the prior year period. Adjusted EBITDA was a record $22.7 million, an increase of approximately 105% from the prior year period, and total GMV was also a record $179.2 million, an increase of approximately 41% from the prior year period. Adjusted net income for the quarter was $11.9 million, or $0.37 diluted earnings per share.

17

71.     In connection with these results, Defendant Angrick issued the following statement:

Record GMV results were driven by ***growth in the volume of capital assets sales*** across our commercial and government clients and benefited from improved merchandising, penetration of existing clients and ***expanding market share*** . . .Our progress has generated strong financial results for our shareholders, exemplified by our adjusted EBITDA of $64.3 million and operating cash flow of $44.0 million over the last 12 months. By continuing to invest in growing our ecommerce business we intend to capture a significant share of large, highly fragmented markets, both in the commercial and public sector, while having a positive impact on our clients' financial and environmental sustainability initiatives. (Emphasis added.)

72.     Angrick and Rallo reiterated these false statements during a conference call with investors, painting a rosy picture of the Company's financials and prospects, stating that they expect the Company to continue to have strong margins and touting "organic growth in [the Company]'s retail supply chain business."

73.     However, at this time, the Defendants knew that they had no reasonable basis to make these representations, because the Company was facing heightened competition that was negatively impacting margins on new and renegotiated commercial contracts, and was unable to capitalize on synergies with its acquisitions. As observed by a former Business Analyst and Contact Center Manager of the Company, Liquidity Services was forced to renegotiate contracts at a much lower level of profitability just to keep the contracts away from its competitors.

74.     On the same day, the Company provided updated guidance for fiscal year 2012 and for the second quarter of fiscal year 2012, including upward revisions in many of its key metrics. Liquidity forecasted that GMV for fiscal year 2012 would range from $700-$740 million, which is an increase over the previous guidance of $690-$730 million, and expected GMV for the second quarter of fiscal year 2012 to range from $165-$175 million. The Company increased its Adjusted EBITDA forecast for fiscal year 2012 to range of $83-$87 million, where its previous guidance ranged from $78-$82 million, with Adjusted EBITDA for the second quarter of fiscal year 2012

ranging from $18.5-$20.5 million. Lastly, Liquidity upped its Adjust Earnings Per Diluted Share forecast for fiscal year 2012 to a range of $1.32-$1.38, which was an increase over the previous guidance range of $1.26-$1.32, with Adjusted Earnings Per Diluted Share expected to range from $0.28-$0.32 for the second quarter of fiscal year 2012.

75.     The Company filed these financial results for the first quarter of 2012 on February 8, 2012. Defendants Angrick and Rallo signed certifications ("Rule 13a-14(a) Certifications") that "based on [their] knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact…" and that they were "responsible for establishing and maintaining disclosure controls and procedures [] and internal control over financial reporting." Further, both Angrick and Rallo certified that they have "disclosed, based on [their] most recent evaluation of internal control over financial reporting, to the [Company's] auditors and the audit committee of the [Company's] board of directors:

> a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the [Company's] internal control over financial reporting.

76.     Despite these falsely optimistic projections and public pronouncements of growth in the non-DoD business, as noted in the above-referenced *Howard* Decision, "according to a former LSI Senior Sales Executive, margins began to decline in the retail division 'as early as March 2011,' and 'declined again during 2012.' Indeed, a former LSI Business Analyst and Contact Center Manager observed that "GMV and margins trended downwards" in the retail division "during his three-year tenure," from October 2010 through November 2013, due to

increasing competition, and margins were compressed due to "competition forc[ing] Liquidity to renegotiate with big-box stores."

77.     Continuing the Company-wide campaign of deceit, on May 4, 2012, the Board allowed the Company to file its Form 10-Q containing its financial results for the second quarter of 2012, reporting record revenue of $125.7 million, an increase of approximately 41% from the prior year's comparable period. Adjusted EBITDA for the quarter increased by approximately 120% from the prior year's comparable period to a record $30.9 million.  The Company reported record GMV of $218.4 million, which was up approximately 59% from the prior year's comparable period. Liquidity also achieved record Adjusted Diluted EPS with $0.52, which was a 136% increase from the prior year's comparable period.

78.     In connection with the press release, Defendant Angrick made the following statements: "LSI reported record results for GMV, Adjusted EBITDA and Adjusted EPS in Q2-12 all of which exceeded our guidance range. Record GMV results were primarily driven by growth in the volume of goods sold in our retail supply chain and municipal government marketplaces by existing and new clients…. Our progress has generated strong financial results for our shareholders, exemplified by our adjusted EBITDA of $81.2 million and operating cash flow of $62.2 million over the last 12 months. By continuing to invest in growing our e-commerce business we intend to capture a significant share of large, highly fragmented markets, both in the commercial and public sector, while having a positive impact on our clients financial and environmental sustainability initiatives."  Defendant Angrick made these statements, as noted in the *Howard* Decision, "[d]espite averments from multiple confidential witnesses that the retail business was already experiencing deteriorating margins due to heightened competition." The 10-Q contained signed Rule 13a-14(a) Certifications by Defendants Angrick and Rallo.

79. On this news, the Company's stock spiked from a pre-announcement close of $54.93 per share on May 2, 2012, up to $62.24 per share at the close of trading on May 3, 2012.

80. However, Liquidity's stock started a downward trend on June 11, 2012, closing at $56.41 on June 15, 2012. On June 20, 2012, Defendant Rallo spoke at a Stifel Nicolaus conference, where he indicated that the Company was not seeing the level of margin expansion that it had experienced recently. On this news, Liquidity's stock tumbled from a close of $57.34 on June 19, 2012, down to a close of $48.51 per share on June 21, 2012.

81. In March through April 2013, the Company's internal assessments over the previous several months were increasingly dire: "Multiple confidential sources noted that 'as the market grew increasingly crowded, Liquidity was forced to renegotiate contracts at a much lower level of profitability—sometimes to the point where the Company was merely breaking even, sometimes to the point where the Company was losing money—just to keep contracts away from competitors.' Several sources revealed that not only were margins 'trending downward throughout 2012,' goods were 'often sold at a loss during 2012' in order to keep customers. In around October 2012…LSI lost a contract with 'a large overstock company to a competitor,' and the loss led to a ten percent reduction in work force at LSI's customer Contact Center." *Howard*, *supra* at 8-9. None of this was reflected in Liquidity's public statements.

82. On February 8, 2013, the Company filed its Form 10-Q with the SEC announcing its financial results for the first quarter of fiscal year 2013. The Company reported consolidated revenue of $122.2 million for the first quarter, which was an increase of approximately 15% from the prior year's comparable period. Adjusted EBITDA for the first quarter of fiscal year 2013 was $24.2 million, approximately 6% above the prior year's comparable period. Total GMV for the first quarter of fiscal year 2013 was $233.4 million, an increase of approximately 30% from the

prior year's comparable period.  The Adjusted Diluted EPS for the first quarter of fiscal year 2013 was $0.41 per diluted share, which was 11% higher than the prior year's comparable period.  The 10-Q contained signed Rule 13a-14(a) Certifications by Defendants Angrick and Rallo.

83.    In connection with the release of the Company's financial results, and despite the Company's increasingly difficult business prospects as noted by numerous LSI insiders reflected in the *Howard* Decision, Angrick made the following statements concerning Liquidity's performance: "Liquidity Services generated strong adjusted EBITDA and EPS results during Q1-FY13 as we expanded margins in our core business due to operating leverage and as we continued to benefit from large commercial and government clients placing their trust in us to handle more of their excess inventory and high value capital asset sales.  We remain focused on executing our long term growth strategy to achieve $2 billion in GMV by fiscal year 2016. During the quarter, we continued to advance our multi-year investment efforts in upgrading our ecommerce platform, investing in our sales and marketing organization and integrating our recent acquisitions …. [O]ur expanded breadth of services, industry expertise and geographic coverage has been well received by our clients and has strengthened our competitive position in the reverse supply chain market. We believe these important investments uniquely address the client needs of Fortune 500 retailers, manufacturers and public sector agencies and position us well for long term profitable growth and market leadership."

84.    On May 7, 2013, Liquidity Services filed its Form 10-Q with the SEC containing its second quarter fiscal year 2013 financial results, which included record revenue in the quarter of $130.3 million.  The Company also achieved record GMV of $259.1 million, which was up 19%. However, the Company's Adjusted EBITDA was $29.2 million, down 6% and Adjusted Diluted EPS of $0.48 was down 8%. Despite the disappointing Adjusted EBITDA and Adjusted

Diluted EPS results, Defendant Angrick insisted that these results were positive, stating that "Liquidity Services generated solid results during Q2-FY13 as we expanded adjusted EBITDA margins in our core business and continued to deliver a high level of service to large commercial and government clients in managing their excess inventory and high value capital asset sales." The 10-Q contained signed Rule 13a-14(a) Certifications by Defendants Angrick and Rallo.

85.     Defendant Angrick also emphasized the Company's growth initiative, which is also known as Liquidity One, in stating that: "We remain focused on executing our long term growth strategy to achieve $2 billion in GMV by fiscal 2016.  During the quarter, we continued to advance our multi-year investment efforts in upgrading our e-commerce platform, investing in our sales and marketing organization and integrating our sales and marketing organization…. We believe these important investments uniquely address the needs of the Fortune 100 and public sector agencies and position us well to drive shareholder value over the next five years."

86.     The Company also provided guidance for fiscal year 2013 and the third fiscal quarter of 2013.  The Company expected GMV for fiscal year 2013 to range from $1.025 billion to $1.1 billion and for the third fiscal quarter from $250-$275 million, Adjusted EBITDA for fiscal year 2013 to range from $115-$121 million and for the third fiscal quarter from $29-$32 million, and Adjusted Diluted EPS for fiscal year 2013 to range from $1.90-$2.02 per share and for third fiscal quarter to range from $0.49-$0.54 per share.  Additionally, Liquidity made the following representation concerning GMV and Revenue Mix: "GMV continues to diversify due to the continued growth in our commercial business and state and local government business. As a result, the percentage of GMV derived from our DoD contracts during Q2-13 decreased to 21.3% compared to 24.3% in the prior year period."  On this news, the Company's stock price rose from

23

its May 1, 2013, close of $32.53 per share to a close of $35.00 per share on May 3, 2013. As a result, the Company's stock price climbed to $40.11 per share on June 3, 2014.

87.     On July 16, 2013, Liquidity issued a press release announcing certain preliminary results for the third quarter of fiscal 2013, ended June 30, 2013.  The Company announced these limited results because it was going to badly miss its previously affirmed guidance. Liquidity announced that it expected to report GMV of $228 million to $231 million compared to the expected range of $250-$275 million; Adjusted EBITDA of $26-$27 million compared to the expected range of $29-$32 million; and Adjusted Diluted EPS of $0.43-$0.45 compared to the expected range of $0.49-$0.54. The Company stated that these results were affected by lower than expected GMV in the Company's capital assets and retail supply chain verticals as a result of lower product flows from existing clients and slower than expected rollout of new client programs.  On this news, the Company's stock declined from a close of $32.38 on July 15, 2013, down to $29.60 per share on July 17, 2013.

88.     During this time, LSI's former Director of Global Compensation noted that "the retail segment was 'sinking fast,' and 'revenue was only coming in from existing contracts, as Liquidity was unable to secure new contracts.'"  At the same time, a "former Director of Global Sales who was employed in Liquidity's retail division from 2009 through May 2014, observed that even the addition of new business did not translate into profitability for the business segment, as the Company had to purchase the retail products it would sell and then warehouse them at its cost." *Howard*, at 10. "An LSI Inventory Control Quality Assurance Analyst pointed out that, in April 2013, LSI renegotiated a contract with Amazon.com with such unfavorable terms that 'Margins were so low…it was not even profitable enough to support labor costs." *Id.* at 11.

89.     On August 9, 2013, the Company filed its Form 10-Q with the SEC detailing its results for the third quarter of 2013. Liquidity reported revenue of $124.2 million for the quarter, up 2% from the prior year's comparable period. Adjusted EBITDA was $26.4 million, a decrease of approximately 21% from the prior year's comparable period.  Total GMV was $230.3 million, an increase of approximately 2% from the prior year's comparable period. Adjusted Diluted EPS was $.044 per share for the quarter, down 21% from the prior year's comparable period.  The 10-Q contained signed Rule 13a-14(a) Certifications by Defendants Angrick and Rallo.

90.     In conjunction with announced financial results, Defendant Angrick made the following statements: "Q3-FY13 results were in line with our pre-announced guidance range. We continue to make important investments in our sales and marketing organization to expand awareness of Liquidity Services as the trusted provider of choice in our industry, which will drive our future growth…. Overall margins in our business remain strong as adjusted EBITDA margins increased to $11.5% in the third quarter from 11.3% in the second quarter primarily as a result of sharper focus and streamlined operations.  Our year-over-year results were impacted by delays in new programs, weaker volumes and pricing in the consumer electronics category and continued repositioning of our GoIndustry marketplace to focus on the key global Fortune 1000 relationships that we expect will drive sustained profitable growth in this business."

91.     The Company also provided updated guidance for fiscal year 2013 and the fourth fiscal quarter of 2013. The Company expected GMV for fiscal year 2013 to range from $925 million to $950 million and for the fourth fiscal quarter from $200 million to $225 million, Adjusted EBITDA for fiscal year 2013 to range from $104 million to $106 million and for the fourth fiscal quarter from $24.0 million to $26.0 million, and Adjusted Diluted EPS for fiscal year 2013 to range from $1.72 to $1.76 per share and for third fiscal quarter to range from $0.39 to

$0.43 per share. Additionally, Liquidity made the following representation concerning GMV and Revenue Mix: "GMV continues to diversify due to the continued growth in our commercial business and state and local government business. As a result, the percentage of GMV derived from our DoD contracts during Q2-13 decreased to 21.3% compared to 24.3% in the prior year period." On this news, the Company's stock began to tick higher from its August 6, 2013, closing price of $28.97 per share up to an August 15, 2013, closing price of $32.56 per share.

92.     Liquidity's business and prospects subsequently entered an extended period of decline. On November 21, 2013, Liquidity filed its Form 10-K with the SEC announcing the Company's financial results for the fiscal year 2013 and fourth quarter of fiscal year 2013. Liquidity reported revenue of $505.9 million for the year, an increase of approximately 6% from fiscal 2012, and revenue of $129.1 million for the quarter, up 6% from the prior year's comparable period. Adjusted EBITDA for fiscal year 2013 was $104.6 million, a 5% decrease from the prior year, and $24.9 million for the quarter, a decrease of approximately 5% from the prior year's comparable period. The Company's GMV for fiscal 2013 was a record $977.3 million, an increase of approximately 13% from fiscal 2012 and $250.5 million for the quarter, up 4% from the prior year's comparable period. Liquidity also reported that its Adjusted Diluted EPS was $1.75 per share for fiscal 2013 and for the quarter, Adjusted Diluted EPS was $0.41, an increase of approximately 3% from the comparable period in the prior year. The 10-K contained signed Rule 13a-14(a) Certifications by Defendants Angrick and Rallo.

93.     In connection with the release of the Company's financial results, Angrick made the following statements: "Liquidity Services generated improved results during Q4-13 based on the expansion of our services with retail supply chain clients and strong growth in our public sector business highlighted by 33% growth in our GovDeals marketplace this quarter. Both our retail

supply chain and capital assets businesses grew sequentially during a seasonally low quarter for the Company and we continued to make progress with our integration of GoIndustry to deliver profitable growth going forward."   Additionally, Angrick stated: "There are compelling opportunities to more broadly extend our technology platform, buyer liquidity and marketplace data to existing and new customers and partners.  During FY14 we will establish and fund a new directive focused on developing new on demand services in these areas to further penetrate and serve our target market.  We believe our continued investments in our people, technology platform and service offering position us well for long term profitable growth and market leadership. Liquidity Services remains focused on executing our long term growth strategy to ensure the Company is well positioned to drive attractive returns for shareholders."

94.     Liquidity also provided guidance for fiscal year 2014 and the first quarter of fiscal year 2014. The Company expected GMV for fiscal year 2014 to range from $1.0-$1.075 billion and for the first quarter of fiscal year 2014 to range from $200-$225 million. Adjusted EBITDA was expected to range from $100-$108 million for fiscal year 2014 and $14-$17 million for the first quarter of fiscal year 2014. Adjusted Diluted EPS was expected to range from $1.60-$1.76 per share for fiscal year 2014 and $0.20-$0.24 for the first quarter of fiscal year 2014. On this news, the Company's stock fell $4.87 per share to $21.13 per share from its previous close of $26.00 per share on November 20, 2013.

95.     On February 7, 2014, Liquidity announced its financial results for the first quarter of fiscal year 2014 and filed its Form 10-Q with the SEC. The Company reported revenue for the first quarter of $121.9 million, which was consistent with prior year's comparable period. Adjusted EBITDA for the quarter was $20.0 million, a decrease of approximately 17% from the prior year's comparable period. GMV for the quarter was $234.4 million, consistent with prior year's

comparable period. The Company's Adjusted Diluted EPS was $0.32 per share, down 22% from the prior year's comparable period. The 10-Q contained signed Rule 13a-14(a) Certifications by Defendants Angrick and Rallo.

96.     In connection with the release of the Company's financial results, Angrick stated the following: "Liquidity Services generated better than expected financial results in Q1-FY14 driven by strong topline performance in our retail supply chain and municipal government businesses. Our retail supply chain business saw sequential growth in GMV as we helped more OEM and retail clients create strategic value in the secondary market for consumer goods through our marketplace channels and service offering. These results were partially offset by a sharp decline in our DoD Surplus business due to changing property mix which has impacted margins. During the quarter, we continued to expand our GovDeals municipal government business in both the U.S. and Canada driven by agencies' desire for more transparency, convenience and value in the sale of surplus assets. We also continued to invest in extending our technology platform, buyer liquidity and marketplace data with existing and new clients to unlock new opportunities during the quarter as our clients seek greater strategic value from the reverse supply chain. We believe our continued investment in innovation and strong client service positions us well to drive long term shareholder value."

97.     Additionally, Angrick made the following statements concerning the follow-on contract with the DoD: "As previously announced, we are pleased to continue to provide services to the [DoD] following the recent award of a sole source follow-on contract that extends the performance period of our Surplus contract by a base term of 10 months with two one-month option periods, resulting in a February 2015 expiry assuming the exercise of all options. The mix of property under the DoD Surplus contract has shifted to a higher volume of lower value, smaller

size items, requiring us to rent more space, incur higher transportation and handling costs, and increase our staff size. We continue to provide a high level of service to our DoD client and plan to participate in the RFP process which is scheduled to conclude in April based on the DoD's current schedule."

98.    Liquidity also affirmed its full year fiscal 2014 guidance and offered its guidance for the second fiscal quarter of 2014. For the second quarter of fiscal year 2014, the Company expected GMV to range from $220 million to $240 million; Adjusted EBITDA to range from $20 million to $23 million; and Adjusted Diluted EPS to range from $0.33 to $0.37 per share.  On this news, the Company's stock closed at $24.07 per share on February 7, 2014, up $2.78 per share from its previous close of $21.29 per share on February 6, 2014. In the weeks that followed, Liquidity's stock would continue to tick higher closing at $26.01 on March 31, 2014.

99.    On April 1, 2014, it was announced that Liquidity was the apparent high bidder for the DoD non-rolling surplus contract with a term of two years followed by four one-year renewal options. The Company's bid was equivalent to 4.35% of the DoD's original acquisition value, which represents an increase of 142% over the original acquisition value. This bid was significantly higher than expected and caused the Company's stock to fall from a close of $26.05 per share on March 31, 2014, to $20.86 per share on April 2, 2014.

100.    On April 3, 2014, Liquidity issued a press release announcing that it withdrew from the live auction bidding for the rolling stock contract. The Company represented that the bidding reached a level where it would be economically unsustainable under a new contract. The Company further explained that while the higher cost of the non-rolling surplus contract and the loss of the rolling stock contract would significantly affect the Company's financial results in 2015, Liquidity's financial results for fiscal year 2014 would be unaffected. This result runs contrary to

the Company's repeated statements regarding the Company's competitive advantage, trust with existing clients and lack of serious competition in the industry.  On this news, Liquidity's stock price fell further from a close $20.86 per share on April 2, 2014 down to $18.36 per share on April 3, 2014.

### C.    The Company Makes Corrective Disclosure

101.    On May 8, 2014, the Company finally revealed the issues it has been facing, and announced that  it would substantially revise its forecast for the full fiscal year 2014, reducing its Gross Merchandise Volume ("GMV") forecast for the year from $1.0-$1.075 billion to $930-$975 million; reducing the expected adjusted EBITDA for the year from $100-$108 million to $70-$80 million; and reducing the adjusted diluted EPS for the year from $1.60-$1.76 per share to $1.10-$1.27 per share. The market therefore learned that the Company was not performing as strongly as previously reported by management, and that the Company's growth is unsustainable. The stock price plummeted 29.6% to close at $12.17 per share that day, down from $17.31 per share on May 7, 2014.

102.    The information disclosed to investors on May 8, 2014 was well known to Individual Defendants since at least February 1, 2012, if not sooner. The problems plaguing the Company have been widely known by Company employees, including Defendants Angrick and Rallo, since these employees reported to them. Accordingly, the Individual Defendants knew that the Company's growth could not be sustained over time and that the acquisitions of GoIndustry and Network International were utter failures. The Individual Defendant, armed with the true knowledge about the state of the Company, caused the Company to misrepresent and omit material information concerning the Company's current and future prospects that mislead the market and artificially inflated the Company's stock price. And, explained herein, they used their non-public

information as well as the false impression they created in the market to enrich and benefit themselves to the detriment of the Company.

103.    The Individual Defendants knew that the Company was experiencing a serious slowdown in its business with the DoD, due to increasing competition in the industry and the nature of the bidding practice utilized by the DoD. The Individual Defendants, however, did not disclose these problems to the investing public.

104.    From February 2, 2012, the day after Liquidity Services' first false disclosure, through May 8, 2014, the day the Company issued its first corrective disclosure, the Company's stock traded at an artificially inflated price, reaching a high of $64.17 per share on May 4, 2012. During this time, Angrick sold 1,642,979 shares, approximately 25% of his holdings – and reaped enormous proceeds of $68.2 million. Notably, all of these sales were strategically made just after the issuance of false and misleading statements that artificially inflated Liquidity Services' stock price.

**D.    Insider Sales By Certain Individual Defendants**

105.    The Individual Defendants used their knowledge of the Company's material, non-public information to sell his personal holdings while the Company's stock was artificially inflated. As officers and directors of Liquidity Services, the Individual Defendants were privy to material, non-public information about the Company's true business health.

106.    While the Company's stock price was artificially inflated, Defendants Angrick, Rallo, Tique, Clough, Gross, Ellis, and Kramer, with the knowledge that the Company's financial statements were false and materially misstated, sold more than $106 million worth of Company stock in order to line their own pockets while unwitting investors bought the stock of a Company they were tricked into believing was prospering.

107.    While in possession of this knowledge, Defendant Angrick sold 1,642,979 shares of his personally held Liquidity Services stock for proceeds of $68.2 million between February 1, 2012 and May 8, 2014. Angrick's sales are suspicious given that the 1.6 million shares sold represent nearly *one quarter* of his entire holdings. In contrast, in the two year period prior to February 1, 2012, Angrick only sold 875,621 shares for proceeds of $15.3 million. Angrick sold nearly double the number of shares during the Pertinent Period than he did in the prior two-year period, earning four-and-a-half times the amount of money.

108.    The Individual Defendants' sales were timed to maximize profit from the Individual Defendants' overall scheme to artificially inflate Liquidity Services' stock price. Following the misleading statements made after the market closed on February 1, 2012, Angrick sold 461,200 shares of Liquidity Services stock at $40.02 for proceeds of *$18,457,224*. Similarly, following the February 1, 2012 disclosure, Defendant Tique sold 25,000 shares for proceeds of $1,085,750; Defendant Gross sold 150,000 shares for proceeds of $6,479,000; Defendant Ellis sold 8,400 shares for proceeds of $336,000; and Defendant Rallo sold 949 shares for proceeds of $48,840.

109.    Following the misleading statements on May 4, 2012 that caused the Company's stock to spike from $54.93 per share on May 2, 2012 to $62.24 per share at the close of trading on May 3, 2012, between May 23, 2012 and June 12, 2012, Angrick took advantage of the rise in Liquidity's stock price by unloading 170,300 shares at prices ranging from $60.57 to $63.80 for a windfall of $10,742,634.97. Thus, between May and June 2012, Angrick sold 170,300 shares of Liquidity shares for total proceeds of *$10,809,652.* Similarly, Defendant Tique sold 132,000 shares for proceeds of $11,604,990; Defendant Clough sold 69,002 shares for proceeds of $4,523,770; Defendant Gross sold 10,625 shares for proceeds of $665,760; Defendant Ellis sold 6,612 shares

for proceeds of $431,230; Defendant Kramer sold 150,000 shares for proceeds of $9,523,500; and Defendant Rallo sold 4,642 shares for proceeds of $292,450.

110.    After issuing a press release on June 15, 2012 disclosing in a Form 8-K announcing that Angrick had entered into a written sales plan pursuant to Rule 10b5-1 (the "June 15 Plan"). Under the June 15 Plan, a broker-dealer was authorized to sell up to a specified number of Defendant Angrick's shares, subject to minimum sales prices thresholds, allowing for the sale of up to approximately 2.5 million of Angrick's shares and permitted the sale of up to 30,000 shares in a single trading day. However, *none* of Angrick's sales were actually made under the June 15 Plan.

111.    On August 3, 2012, Angrick severed the June 15 Plan, noting that he "is currently evaluating options to purchase shares of the Company's common stock" – something that never occurred – and Liquidity's stock rose from a close of $39.50 per share on August 2, 2012, to a close of $40.47 per share on August 3, 2012 from the misrepresentation. Defendant Angrick later adopted a new 10b5-1 plan on August 8, 2012 (the "August 8 Plan"). However, a mere three sales of stock were effected pursuant to the August 8 Plan. And, those sales were made with the inside knowledge that the Company's financial prospects were not as Angrick and other Defendants had caused the market to believe.

112.    On September 27, 2012, despite Liquidity's previous proclamation that Angrick was exploring avenues from which to purchase shares, he *sold* 1,222 shares at the price of $50.00 per share for proceeds of $56,100.00. On October 2, 2012, Angrick *sold* another 11,781 shares at the price of $46.04 per share for proceeds of $542,397.24.  Similarly, after the stock rose on August 3, 2012, Defendant Rallo *sold* 15,823 shares for proceeds of $811,230.

113.     Angrick continued his selling spree between March 4, 2013 and April 10, 2013. Following the materially misleading statements made in February 2013, Angrick sold 235,937 shares of Liquidity's common stock for proceeds of $7,835,335.94.   None of these sales were pursuant to the August 8 Plan. According to the Unanimous Written Consent of the Board of Directors dated March 4, 2013, the full Board approved of the sale by Angrick of up to 250,000 shares of Company stock outside the August 8 Plan. *See* LQDT-220 0000149-150. Defendant Rallo also sold stock during this period, 1,027 shares for proceeds of $30,300.

114.     On April 30, 2013, the Board met and unanimously approved changes to the August 8 Plan, further increasing the daily sale limit for open market trades and sales to 1000,000 from 30,000; increasing the limit on total sales outside of a 10b5-1 plan in any single trading window to 500,000 shares from 100,000 shares. LQDT-220 0000153-158.

115.     Following materially misleading statements made in May 2013 that caused the Company stock to climb during the month of May to $40.11 per share on June 3, 2014, and as the Company's stock climbed, Defendant Angrick unloaded more shares of the Company on the open market, selling 200,000 shares for proceeds of $7,967,500 in the month of June 2013. A month later, on July 2, 2013, Defendant Rallo sold 24,299 shares for proceeds of $850,470.

116.     The Board knew that Angrick's stock dump was problematic to the Company, as shown by the minutes from the Board Meeting dated August 6, 2013. At the August 6, 2013 meeting, the Board reviewed and unanimously approved executive stock ownership guidelines. LQDT-220 0000164-167. The Board presentation noted that "currently LSI Executives do not hold equity consistent with shareholder expectations." LQDT-220 0000169.

117.     Despite acknowledging the stock ownership problem, the Board approved another round of Angrick's trades for the three-week period between September 9, 2013 and October 1,

2013, following materially misleading statements made in August 2013 that caused the Company stock to increase from $28.97 per share on August 6, 2013 to $32.56 on August 15, 2013. After being named to Fortune's 100 Fastest Growing Companies list on September 3, 2013 based on metrics disclosed by the Company itself, the Company's stock price rose from a previous close of $29.96 per share on September 6, 2013, to $34.44 per share at close on September 9, 2013. With the Company's stock price temporarily inflated, Defendant Angrick took advantage by engaging in further mass insider trading. From September 9, 2013 through October 2, 2013, he sold 626,270 shares of stock for proceeds of $22,147,454.66. Defendant Rallo sold 15,824 shares for proceeds of $543,230 during the same period of time. Unsurprisingly, the Company's stock declined a week later when the Company announced unfavorable gross sales volume and gross sales numbers on October 7, 2013.

> **E.      Damages To The Company**

118.    As a direct and proximate result of the Individual Defendants' actions, Liquidity Services has expanded, and will continue to expand, significant sums of money. Such expenditures include, but are not limited to:

a)      damages to the Company from the insider trading alleged herein;

b)      costs incurred from investigating, defendant the Company and certain officers, and paying any settlement in the consolidated class action for violations of federal securities laws;

c)      costs incurred from compensation and benefits paid to the defendants who have breached their duties to Liquidity Services; and

d)      damages to Liquidity Services' corporate image and goodwill. The Company has suffered, and for at least the foreseeable future, will suffer from what is known as

the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that Liquidity Services' ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND REQUIREMENT ALLEGATIONS

119.    Plaintiff brings this action derivatively in the right and for the benefit of Liquidity Services to redress Defendants' breaches of fiduciary duties and other violations of law, including waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Director Defendants. Liquidity Services is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

120.    Plaintiff owns Liquidity Services common stock and has owned Liquidity Services common stock since June 2013 and thereafter throughout the continuous course of defendants' misconduct.

121.    Plaintiff will adequately and fairly represent the interests of Liquidity Services and its stockholders in enforcing and prosecuting its rights.

122.    At the time this action was initiated, the Board was comprised of seven (7) directors: Defendants Angrick, Mateus-Tique, Clough, Gross, Infante, Ellis, and Kolodzieski. Plaintiff did not issue a demand upon the Board prior to instituting this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

### A.    Demand Is Excused Because The Current Director Defendants Face A Substantial Likelihood of Liability for Their Misconduct

**Defendant Angrick**

123.    As alleged above, Angrick breached his fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding the nature and sustainability of the Company's sales growth.

124.    Demand upon Angrick is also excused because he engaged in illegal insider trading during the Pertinent Period. Angrick sold 1,706,610 shares during the period in question, for proceeds in excess of $68 million. Angrick made these sales while in possession of materially adverse non-public information about the Company's declining business. Accordingly, due to Angrick's participation and profit in illegal insider trading which is not protected conduct under the business judgment rule and his resulting exposure to potential individual financial liability, he is not disinterested and cannot exercise independent business judgment on the issue of whether Liquidity Services should prosecute this action. As a result, demand on Angrick is futile and therefore excused.

125.    Angrick's insider trading renders demand upon him futile for the additional reason that he cannot exercise independent judgment when considering illegal insider trading claims against the other Insider Trading Defendants because he engaged in the same illegal conduct.

126.    Moreover, the principal professional occupation of Defendant Angrick is his employment with Liquidity Services as the Company's CEO and Chairman of the Board, pursuant to which he has received and continues to receive substantial monetary compensation (below) and other benefits as alleged above.

| Name and Principal Position | Year | Salary ($)(1) | Bonus ($) | Stock Awards ($)(2) | Option Awards ($)(2) | Non-Equity Incentive Plan Compensation | All Other Compensation ($)(4) | Total ($) |
|---|---|---|---|---|---|---|---|---|

($)(3)

| | | | | | | |
|---|---|---|---|---|---|---|
| William P. Angrick, III | 2015 | 400,000 | 1,027,092 | 624,184 | 118,600 | 11,363 | 2,181,239 |
| *Chairman and Chief* | 2014 | 400,000 | 999,072 | 702,124 | 126,000 | 12,365 | 2,239,561 |
| *Executive Officer* | 2013 | 600,000 | 720,036 | 432,722 | 255,990 | 11,875 | 2,020,623 |

Accordingly, Angrick is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation. Demand is therefore futile as to Angrick.

127.    Demand is also futile as to Angrick and a majority of the Board because Angrick, as well as the other Current Director Defendants, violated his fiduciaries duties by knowingly failing to fulfill their duties of care and loyalty by failing to implement any meaningful changes to the Company's internal controls and procedures regarding the Company's sales practices compliances guidelines and disclosure practices.

128.    Angrick and the Current Director Defendants failed to implement these changes even though they knew that the Company was engaging in illegal activities that directly violated federal securities laws. The Current Director Defendants' failure to implement any meaningful changes to Liquidity Services' practices, evidences their complete disregard and abdication of their fiduciary duties.

**Defendant Tique**

129.    Demand upon Tique is also excused because he engaged in illegal insider trading during the Pertinent Period. Tique sold 232,000 shares of Company stock for proceeds of $12,690,740. Tique made these sales while in possession of materially adverse non-public information about the Company's declining business. Accordingly, due to Tique's participation in illegal insider trading and his resulting exposure to potential individual financial liability, he is not

disinterested and cannot exercise independent business judgment on the issue of whether Liquidity

Services should prosecute this action. As a result, demand on Tique is futile and therefore excused.

130.     Tique's insider trading renders demand against him futile for the additional reason

that he cannot exercise independent judgment when considering illegal insider trading claims

against the other Insider Trading Defendants because he engaged in the same illegal conduct.

131.     Demand is also excused for failing to disclose material facts to shareholders and

the public in Board approved SEC filings which exposes him to a substantial risk of non-

exculpated liability because he knowingly and intentionally failed to fulfill his fiduciary duties to

Liquidity Services.

132.     Demand is also futile as to Tique and a majority of the Board because Tique, as

well as the other Current Director Defendants, violated his fiduciaries duties by knowingly failing

to fulfill their duties of care and loyalty by failing to implement any meaningful changes to the

Company's internal controls and procedures regarding the Company's sales practices compliances

guidelines and disclosure practices.

133.     Tique and the Current Director Defendants failed to implement these changes even

though they knew that the Company was engaging in illegal activities that directly violated federal

securities laws. The Current Director Defendants' failure to implement any meaningful changes to

Liquidity Services' practices, evidences their complete disregard and abdication of their fiduciary

duties.

**Defendant Clough**

134.     Demand upon Clough is also excused because he engaged in illegal insider trading

during the Pertinent Period. Clough sold 69,002 shares of Company stock at $65.56 per share for

proceeds of $4,523,771. Clough made these sales while in possession of materially adverse non-

public information about the Company's declining business. Accordingly, due to Clough's participation in illegal insider trading and his resulting exposure to potential individual financial liability, he is not disinterested and cannot exercise independent business judgment on the issue of whether Liquidity Services should prosecute this action. As a result, demand on Clough is futile and therefore excused.

135.    Clough's insider trading renders demand against him futile for the additional reason that he cannot exercise independent judgment when considering illegal insider trading claims against the other Insider Trading Defendants because he engaged in the same illegal conduct.

136.    Demand is also excused for failing to disclose material facts to shareholders and the public in Board approved SEC filings which exposes him to a substantial risk of non-exculpated liability because he knowingly and intentionally failed to fulfill his fiduciary duties to Liquidity Services.

137.    Demand is also futile as to Clough and a majority of the Board because Clough, as well as the other Current Director Defendants, violated his fiduciaries duties by knowingly failing to fulfill their duties of care and loyalty by failing to implement any meaningful changes to the Company's internal controls and procedures regarding the Company's sales practices compliances guidelines and disclosure practices.

138.    Clough and the Current Director Defendants failed to implement these changes even though they knew that the Company was engaging in illegal activities that directly violated federal securities laws. The Current Director Defendants' failure to implement any meaningful changes to Liquidity Services' practices, evidences their complete disregard and abdication of their fiduciary duties.

**Defendant Ellis**

139.    Demand upon Ellis is also excused because he engaged in illegal insider trading during the Pertinent Period. Ellis sold 8,400 shares of Company stock on February 6, 2012 for $40 per share for proceeds of $336,000 and 6,612 shares of Company stock on May 10, 2012 for $65.22 per shares for proceeds of $431,234. Ellis made these sales while in possession of materially adverse non-public information about the Company's declining business. Accordingly, due to Ellis's participation in illegal insider trading and his resulting exposure to potential individual financial liability, he is not disinterested and cannot exercise independent business judgment on the issue of whether Liquidity Services should prosecute this action. As a result, demand on Ellis is futile and therefore excused.

140.    Ellis's insider trading renders demand against him futile for the additional reason that he cannot exercise independent judgment when considering illegal insider trading claims against the other Insider Trading Defendants because he engaged in the same illegal conduct.

141.    Demand is also excused for failing to disclose material facts to shareholders and the public in Board approved SEC filings which exposes him to a substantial risk of non-exculpated liability because he knowingly and intentionally failed to fulfill his fiduciary duties to Liquidity Services.

142.    Demand is also futile as to Ellis and a majority of the Board because Ellis, as well as the other Current Director Defendants, violated his fiduciaries duties by knowingly failing to fulfill their duties of care and loyalty by failing to implement any meaningful changes to the Company's internal controls and procedures regarding the Company's sales practices compliances guidelines and disclosure practices.

143.    Ellis and the Current Director Defendants failed to implement these changes even though they knew that the Company was engaging in illegal activities that directly violated federal

securities laws. The Current Director Defendants' failure to implement any meaningful changes to Liquidity Services' practices, evidences their complete disregard and abdication of their fiduciary duties.

144.     Ellis, as a member of the Audit Committee, reviewed and approved the improper statements and earnings guidance. The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements. Thus, Ellis was responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls. Moreover, Ellis reviewed and approved the improper press releases made to the public. Despite his knowledge or because of his reckless disregard, Ellis caused the improper statements. Accordingly, Ellis breached their fiduciary duty of loyalty and good faith because he participated in the wrongdoing described herein. Thus, Defendant Ellis faces a substantial likelihood of liability for his breach of fiduciary duties so any demand upon them is futile and therefore excused.

**Defendant Gross**

145.     Demand upon Gross is also excused because he engaged in illegal insider trading during the Pertinent Period. Gross sold 139,375 shares of Company stock for proceeds of $7,144,962. Gross made these sales while in possession of materially adverse non-public information about the Company's declining business. Accordingly, due to Gross's participation in illegal insider trading and his resulting exposure to potential individual financial liability, he is not disinterested and cannot exercise independent business judgment on the issue of whether Liquidity Services should prosecute this action. As a result, demand on Gross is futile and therefore excused.

146.     Gross's insider trading renders demand against him futile for the additional reason that he cannot exercise independent judgment when considering illegal insider trading claims against the other Insider Trading Defendants because he engaged in the same illegal conduct.

147.     Demand is also excused for failing to disclose material facts to shareholders and the public in Board approved SEC filings which exposes him to a substantial risk of non-exculpated liability because he knowingly and intentionally failed to fulfill his fiduciary duties to Liquidity Services.

148.     Demand is also futile as to Gross and a majority of the Board because Gross, as well as the other Current Director Defendants, violated his fiduciaries duties by knowingly failing to fulfill their duties of care and loyalty by failing to implement any meaningful changes to the Company's internal controls and procedures regarding the Company's sales practices compliances guidelines and disclosure practices.

149.     Gross and the Current Director Defendants failed to implement these changes even though they knew that the Company was engaging in illegal activities that directly violated federal securities laws. The Current Director Defendants' failure to implement any meaningful changes to Liquidity Services' practices, evidences their complete disregard and abdication of their fiduciary duties.

150.     Gross, as a member of the Audit Committee, reviewed and approved the improper statements and earnings guidance. The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements. Thus, Gross was responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls. Moreover, Gross reviewed and approved the improper press releases made to the public. Despite his knowledge or because of his reckless

disregard, Gross caused there improper statements. Accordingly, Gross breached their fiduciary duty of loyalty and good faith because he participated in the wrongdoing described herein. Thus, Defendant Gross faces a substantial likelihood of liability for his breach of fiduciary duties so any demand upon them is futile and therefore excused.

**Defendant Infante**

151.    Demand is also futile as to Infante and a majority of the Board because Infante, as well as the other Current Director Defendants, violated her fiduciaries duties by knowingly failing to fulfill their duties of care and loyalty by failing to implement any meaningful changes to the Company's internal controls and procedures regarding the Company's sales practices compliances guidelines and disclosure practices.

152.    Infante and the Current Director Defendants failed to implement these changes even though they knew that the Company was engaging in illegal activities that directly violated federal securities laws. The Current Director Defendants' failure to implement any meaningful changes to Liquidity Services' practices, evidences their complete disregard and abdication of their fiduciary duties.

**Defendant Kolodzieski**

153.    Demand is also futile as to Kolodzieski and a majority of the Board because Kolodzieski, as well as the other Current Director Defendants, violated his fiduciaries duties by knowingly failing to fulfill their duties of care and loyalty by failing to implement any meaningful changes to the Company's internal controls and procedures regarding the Company's sales practices compliances guidelines and disclosure practices.

154.    Kolodzieski and the Current Director Defendants failed to implement these changes even though they knew that the Company was engaging in illegal activities that directly violated

federal securities laws. The Current Director Defendants' failure to implement any meaningful changes to Liquidity Services' practices, evidences their complete disregard and abdication of their fiduciary duties.

155.    The Current Director Defendants' challenged misconduct at the heart of this case constitutes the direct facilitation of the wrongful activity alleged herein, including knowingly and consciously presiding over the Company's systematic violations of the Exchange Act and other state laws and regulations. The Board affirmatively adopted, implemented, and condoned a business strategy based on deliberate, widespread, blatant violations of law. Breaking the law is not a legally protected business decision, and such conduct can in no way be considered a valid exercise of business judgment. Accordingly, demand on the Board is excused.

156.    A derivative claim to recoup damages for harm caused to the Company by unlawful activity represents a challenge to conduct that is outside the scope of the Board's business judgment—conduct for which the Board should face potential personal liability. Allowing the Company to violate laws and regulations, or looking the other way while refusing to prevent others under the Board's control from committing these wrongful acts are all forms of misconduct that cannot under any circumstances by examples of legitimate business conduct. The protections of the "business judgment rule" do not extend to such malfeasance. Nor can such malfeasance ever constitute the "good faith" required of corporate fiduciaries.

157.    Moreover, the acts complained of constitute violations of the fiduciary duties owed by Liquidity Services' officers and directors and these acts are incapable of ratification.

158.    Liquidity has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants have not filed any lawsuits

against themselves or others who were responsible for that wrongful conduct to attempt to recover for Liquidity Services any part of the damages the Company suffered and will suffer thereby.

159.    If the Individual Defendants are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Complaint by directors and officers' liability insurance ("D&O insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of the Company. However, the insurance policies covering the Individual Defendants in this case may contain provisions that eliminate coverage for any action brought directly by the Company against these defendants, a standard provision found in D&O insurance known as the "insured versus insured exclusion."   As a result, if these directors were to cause Liquidity Services to sue themselves or certain of the officers of the Company, there may  be no D&O insurance protection and, thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no D&O insurance, then the Current Director Defendants will not cause the Company to sue the defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

160.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the Current Director Defendants have failed and refused to seek to recover for the Company for any of the wrongdoing alleged by plaintiff herein.

## CAUSES OF ACTION

### COUNT I

### DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY
**(Against the Individual Defendants)**

161.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

162.     As directors, officers and high level employees of the Company, all of the Individual Defendants owed Plaintiff, the stockholders – and each other – fiduciary duties of good faith, loyalty and care.

163.     Specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within the Company, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein. The Individual Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration, in not knowing that: (i) the Company's apparent revenue growth was unsustainable and primarily the result of known but undisclosed increased pricing pressures due to intense competition in the industry and, as a result, the Company was forced to provide steep discounts in order to retain certain of its customers; (ii) the Company's acquisitions were not profitable as disclosed to the investing public and financial analysts and were failing to create the promised synergies. Accordingly, the Individual Defendants breached their duty of care and loyalty to the Company.

164.     The Director Defendants, other than Angrick, as directors of the Company, owed Liquidity Services the highest duty of loyalty. These defendants breached their duty of loyalty by recklessly permitting the improper activity concerning the Company's false statements and permitting insider sales by defendant Angrick.  As the minutes for the Meetings of the Board of

Directors show, the Board had knowledge that Angrick planned on making large trades of Company stock (LQDT-220 0000022-23; 0000027;). Accordingly, the Director Defendants breached their duty of loyalty to the Company.

165.     Defendants Ellis, Gross, and Infante, as members of the Audit Committee, breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. These defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

166.     Defendant Angrick breached his duty of loyalty by selling Company stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's stockholders. The information described above was proprietary, non-public information concerning the Company's future business prospects. It was a propriety asset belonging to the Company, which Angrick used for his own benefit when they sold Liquidity Services common stock.

167.     As a direct and proximate result of the Individual Defendants' conscious failure to perform their fiduciary obligations, Liquidity Services has sustained significant damages, not only monetarily, but also to its corporate image and goodwill. Such damage included, among other things, the substantial penalties, fines, liabilities and expenses described herein.

168.     As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

169.     Plaintiff, on behalf of Liquidity Services, has no adequate remedy at law.

## COUNT II
## DERIVATIVE CLAIM FOR WASTE OF CORPORATE ASSETS

**(Against Individual Defendants)**

170.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

171.     As a result of the false statements concerning the nature of the Company's growth and future growth prospects, the Individual Defendants have caused Liquidity Services to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

172.     As result of the waste of corporate assets, the Individual Defendants are liable to the Company.

173.     Plaintiff, on behalf of Liquidity Services, has no adequate remedy at law.

**COUNT III**
**DERIVATIVE CLAIM FOR UNJUST ENRICHMENT**
**(Against Individual Defendants)**

174.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

175.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of the Company. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching their fiduciary duties owed to the Company.

176.     Defendants Angrick, Rallo, Clough, Ellis, Gross, Kramer, and Tique sold Company stock while in possession of material, adverse non-public information that artificially inflated the price of Liquidity Services stock. As a result, these defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

177.     Plaintiff, as a stockholder and representative of Liquidity Services, seeks restitution, damages, an order of this Court disgorging all profits, benefits, and other compensation obtained by these Defendants from their wrongful conduct and fiduciary breaches, and other relief for the Company, in an amount to be proven at trial.

178.     Plaintiff, on behalf of Liquidity Services, has no adequate remedy at law.

**COUNT IV**
**DERIVATIVE *BROPHY* CLAIM FOR INSIDER TRADING**
**(Against Individual Defendants)**

179.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

180.     The Insider Trading Defendants owed and owe fiduciary duties to the Company to disclose material information to the Company's shareholders and to refrain from using non-public material information in connection with trading their personal holdings of Liquidity Services stock.

181.     The Insider Trading Defendants knew and understood but concealed that fact that the Company was grappling with a significant decline in the business including intense competition with other companies for the DoD contracts and failing to realize benefits from the acquisitions, and omitted material information about these matters from their public filings.

182.     This information was proprietary non-public information concerning the Company's business, financial condition and regulatory issues. It was proprietary information belonging to the Company, which the Insider Trading Defendants used for their own benefit when they sold Liquidity Services stock during the Pertinent Period.

183.     Because use of the Company's proprietary information for their own gain constitutes a breach of the Insider Trading Defendants' duties of loyalty and care, the Company is

entitled to damages and to the imposition of a constructive trust on any profits they obtained thereby.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against the Defendants as follows:

1.       Determining that this action is a proper derivative action maintainable under law and that demand is excused;

2.       Declaring that the Individual Defendants have breached their fiduciary duties to Liquidity Services;

3.       Ordering the Insider Trading Defendants to disgorge all ill-gotten gains from insider trading transactions;

4.       Granting judgment in Plaintiff's favor on all claims;

5.       Directing Liquidity Services to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Liquidity Services and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporations and taking such other actions as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1. A proposal to strengthen the Company's controls overs financial reporting;

2. A provision to control insider selling;

3. A proposal to strengthen Liquidity Services' oversight of its disclosure procedures;

4. A proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Boards; and

5.   A provision to permit the stockholders of Liquidity Services to nominate at least three candidates for election to the Board;

6.   Awarding appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties;

7.   Awarding the Company damages in an amount to be proven at trial;

8.   Awarding the costs and disbursements of this action, including its reasonable attorneys' fees and expenses; and

9.   Awarding such other relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: August 8, 2016                          LEVI & KORSINSKY LLP

                                                  */s/* Elizabeth K. Tripodi
                                             Elizabeth K. Tripodi, Esq. (#979154)
                                             Donald J. Enright, Esq. (#MD013551)
                                             1101 30th Street NW
                                             Suite 115
                                             Washington, D.C. 20007
                                             Telephone: (202) 524-4290
                                             Facsimile: (202) 333-2121

                                             *Counsel for Plaintiff*

*Of Counsel*:
Peter C. Harrar
Benjamin Y. Kaufman
Daniel Tepper
Gloria Kui Melwani
WOLF HALDENSTEIN ADLER FREEMAN
& HERZ LLP
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600